Bakeman v. Rose and wife.

---

BAKEMAN *vs.* ROSE and wife.

Evidence of *general reputation* that a female witness is a *prostitute*, is inadmissible for the purpose of impeaching the witness.

Where a judge in his charge to the jury, after stating that the testimony of a witness is destroyed when his character for truth is impeached by witnesses, added, " but that if an equal number of witnesses, of equal respectability and means of knowledge, be produced to sustain his reputation, the character of the witness will stand as if no impeachment had been made or attempted, and that it was the province of the jury to say, under all the circumstances, whether the witness was impeached or not," it was held, that the charge furnished no ground for a new trial.*

Where a witness, called to sustain an impeached witness, states on his *direct examination*, that he has heard the character of the witness spoken against, it is admissible to the party calling him to inquire the names of the persons referred to by him.

[147]    ERROR from the supreme court. The wife of Rose, previous to her marriage, brought an action of assault, battery and false imprisonment against Bakeman, in the Oswego common pleas, and established her case by the testimony of a female of the name of *Sally Holton*. The defendant proved, by a

---

* See the dissenting opinion of *Senator* TRACY upon this point. Upon the principal question, Senator Tracy concurs in opinion with the supreme court and with the chancellor, that the witness in this case could not be impeached in the manner in which it was proposed to be done by proving her *general reputation* to be that of a prostitute; but he holds, that by varying the form of inquiry to be put to the impeaching witnesses, the impeachment might have been effected. Whether the form of inquiry put to a person called to impeach a witness should be " whether from his knowledge of the general character of the witness he would believe him on his oath," or whether it should be, " what is the general reputation of the witness for truth," s discussed by the senator, and the preference given to the former mode.

. Bakeman v. Rose and wife.

number of witnesses, that the character of Sally Holton for truth and veracity was *bad*, and the plaintiff, by a number of witnesses, proved her character for truth and veracity to be *good*. One of the witnesses then called by the plaintiff testified, that since the month of September, 1833, (the assaults as proved having been committed more than a year previous to that time,) he had heard some people speak against the character of Sally Holton. He was asked by the plaintiff's counsel, who the persons were whom he had thus heard speak ; which question the defendant's counsel insisted was inadmissible on the *direct examination*. The court overruled the objection, and suffered the question to be put, " and the same" (as the bill of exceptions stated) " was answered by the witness, but no testimony was introduced under this decision of the court." The defendant also offered to prove, *that the reputation of Sally Holton was that of a public prostitute*. The plaintiff objected to the evidence, and the court sustained the objection. In the charge to the jury, the judge who delivered the same, in commenting upon the evidence, remarked in substance, that when the character of a witness for truth and veracity is impeached by a great number of witnesses, the weight of the witness' testimony is destroyed ; but that if an " equal number of witnesses, of equal respectability and means of knowledge, be produced by the opposite party to sustain the reputation of the witness, the character of the witness will stand as if no impeachment had been made or attempted, and that it was the province of the jury to say, under all the circumstances, whether the witness was impeached or not." The defendant excepted to the [148] decisions of the court in the admission and rejection of the evidence. Whether the exception extended to the charge to the jury, was left in doubt from the manner in which the bill was drawn up. The jury found a verdict for the plaintiff for $1000, upon which the common pleas rendered judgment, and the supreme court affirmed the judgment of the common pleas ; whereupon the defendant removed the record into this court by writ of error. For the reasons of the supreme court for affirming the judgment of the common pleas, see 14 *Wendell*, 109, *et seq*.

The cause was argued here by

*M. T. Reynolds*, for the plaintiff in error.

*S. Stevens*, for the defendant in error.

After advisement, the following opinions were delivered:

By the CHANCELLOR. The first and most important question in this case is, whether the plaintiff in error should have been permitted, in addition to the usual inquiries as to the general character of the principal witness against him for truth and veracity, to prove also that she had the general character of a prostitute. As it is not the business of this court to make laws, but merely to declare what the existing law is, it is only necessary to say that it is perfectly well settled, both in this state and in England, that the general character of the witness alone can be inquired into for the purpose of impeaching his credibility : that is, what is his general character for truth and veracity ; or whether his general moral character is such that he is not entitled to credit. But you cannot prove that he has been guilty of any particular crime, or species of crimes, or immoralities, or that he has the reputation of being guilty of any particular class of crimes. You cannot therefore inquire whether the witness has the general reputation of being a thief, prostitute, murderer, forger, adulterer, gambler, swindler, or the like ; although each and every of such offences, to a greater or less degree, impairs the moral character of the witness, and tends to impeach his or her veracity. And if a party is not permitted [149] to impeach the witness by proving that he has the general character of a thief or a swindler, there can be no good reason why he should be permitted to impeach the witness by showing a general reputation of being unchaste. Indeed, it would be much safer for a female witness to permit the adverse party to prove the fact that she was a common prostitute, than to attempt to impeach her credit

Bakeman *v*. Rose and wife.

by showing it by *general reputation :* as there would be some chance of refuting the charge, if it was false, in the one case, when there would not be any in the other. Instead, also, of allowing the chastity of female witnesses to be drawn in question in that manner, it would be much better to resort at once to the principles of the Persian, Gentoo and Mussulman laws, to which we were referred on the argument : which do not allow the testimony of any female except in special cases, where, from the nature of the facts to be proved, it is presumed no male witness could have been present.

The question as to the admissibility of such evidence to impeach the character of a witness, was distinctly passed upon by the supreme court of this state, more than twenty years since, in the case of *Jackson* v. *Lewis,* (13 *Johns. R.,* 504,) and I believe the correctness of that decision has never been doubted by the profession here. The only case I have been able to find, in the courts of any of our sister states, in which a different rule has been attempted to be adopted, is that of *The Commonwealth* v. *Murphy,* (14 *Mass. R.,* 387,) before the supreme court of Massachusetts. A very loose note of this decision is stated by Mr. Tyng on the relation of some other person ; and which, if ever made, was virtually overruled by the same court in the subsequent case of *The Commonwealth* v. *Moore,* (3 *Pick.,* 194.) But even in *Murphy's case,* if the report be correct, the party was not permitted to give evidence of general reputation of unchastity. He was allowed to prove the actual fact that the witness was a prostitute, and had been the mother of several bastard children. The decision, in any view of it, was wrong, and ought not to be followed as a precedent here.

[150]    The court was clearly right in this case, in permitting the question to be asked of one of the plaintiff's witnesses, who it was that he had heard speak against the character of Sally Holton. It appears from the testimony that the several assaults upon the plaintiff were committed in the spring and summer of 1832, and some of the witnesses speak of reports against her character subsequent to that time. The counsel for the plaintiff had a perfect right to inquire from whom those reports came, to enable him, if possible, to show that they had been raised by the defendant or his friends for the purpose of discrediting the principal witness against him in this matter, after such testimony had become important. The bill of exceptions states, however, that no testimony was introduced under this decision, although the question was answered. From which I think we are bound to infer the witness answered he did not recollect who the persons were from whom he heard the reports. If this was the fact, the plaintiff in error could not have been in any way prejudiced by such decision, even if it was wrong.

The charge of the court to the jury was not excepted to on the trial, and therefore is not a proper subject of review here, if it was wrong ; but I perfectly agree with the late chief justice, who delivered the opinion of the supreme court, that there was nothing exceptionable in the charge itself which could mislead the jury in relation to their legal right to weigh the evidence as to the character of the principal witness, and to decide according to their convictions as to the truth or falsehood of her testimony. For these reasons I am perfectly satisfied that the decision of the court below was correct, and that the judgment of the supreme court should be affirmed.

By Senator TRACY. It is a little remarkable, considering the great number of times the subject must have come under discussion, that *it is not incontestably settled,* what is the precise form of inquiry to be resorted to for the purpose of impeaching the general credibility of a witness. Although certain general principles in regard to this matter are very well established, yet so far as I have looked, I find [151] no two elementary writers on the subject of evidence, and scarcely any two judicial decisions, to agree exactly in the form of words to be used, notwithstanding the means for determining the weight that should be given to a witness' testimony, may often depend very much on the form in which the inquiry

.Bakeman *v.* Rose and wife.

as to his general credibility is made. *Phillips,* in his *Treatise on Evidence,* (1 *vol.* 229,) quoting Lord Ellenborough, (4 *Esp Cas.* 103,) says the regular mode is to inquire of the witnesses " whether they have the means of knowing the former witnesses' general character, and whether from such knowledge they would believe him on his oath." But *Swift* in his *Treatise of Evidence,* (143 ) says, " the only proper question is, whether he knows the general reputation of the witness, in point of truth, among his, neighbors, and whether it is good or bad ;" while *Starkie,* (1 *vol.* 145,) asserts the only proper question to be, " whether he would believe him upon his oath." In the courts in this state, the form prescribed by Swift is, I believe, most commonly adopted ; and yet I am not aware that this or any other form has been distinctly fixed by judicial decision. In *The People* v. *Mather,* (4 *Wendell,* 229,) the court refers to the forms of the inquiry as given by Phillips and by Starkie, but without discriminating between them, or expressly sanctioning either. The consequence of this want of precision in a matter, which at first glance would seem to be of very little moment, is, I apprehend, not only to occasion frequent contentions at trials, but sometimes to lead to serious injustice. If the inquiry be confined to the general reputation of the witness, in point of truth, among his neighbors, it will happen in some cases, that a witness whose general moral character is deservedly infamous, is allowed to impress his testimony on the jury, with unqualified weight, simply because mendacity may have been relatively too insignificant an item in the catalogue of his vices, to have attracted the attention or elicited the remark of his acquaintance ; or it may happen, that though generally of so depraved or corrupt a life that no one would doubt the facility with which he might be suborned to swear falsely, yet from caution or calculation, he may have observed that general veracity in his common intercourse, or from natural taciturnity a [152] " wilful stillness entertained," which would render his reputation impregnable to this form of inquiry. On the other hand, a witness incapable of the total depravity of deliberate perjury, may have destroyed his general reputation for truth, by a habit of exaggeration, of heedless promises, of over-indulged levity, or other petty falseness, which, though immoral and highly censurable, does not necessarily denote that foul corruption of moral principle which is to be implied in one not worthy of any credit upon his oath.

For these considerations, I prefer the form of inquiry sanctioned by Lord Ellenborough, and which is given by Phillips, as less objectionable than the others, and perhaps as effectual to the object desired as any that will be proposed, and yet this possibly may admit of some useful qualification ; but that the credibility of a witness should be sought through his general moral character I have no doubt  This has been settled in some of our sister states, particularly in North Carolina and Kentucky, where the question whether the witness is a person of bad moral character, has been allowed. (2 *Haywood,* 300. 3 *Marshall,* 261.) And everywhere, notwithstanding the technical embarrassments which are supposed to be in the way of such an inquiry, the obvious good sense of it is continually urging it to be attempted, and in some form it is frequently accomplished. That the general moral character of witnesses will have naturally a considerable influence upon the credit of their testimony, is a fact which cannot be doubted. One of the great benefits of trial by jury was supposed to exist in the circumstance, that the jury being from the vicinage of the parties and the witnesses, were better able to judge of their relative honesty and credibility. It would seem, therefore, in accordance with this principle, that under the modern forms of impanelling juries, which do not in many cases afford to jurors the means of judging from personal knowledge of the character of witnesses the measure of credit to be given to them, that as liberal a course for supplying this deficiency of knowledge should be allowed as would be compatible with the rights of the witnesses ; for while the policy of the law is against extending the absolute exclusion of testimony it [153]

Bakeman *v.* Rose and wife.

should favor in the fullest degree practicable, the means for ascertaining its just value. Had this principle been heretofore sufficiently explained and impressed by our courts, we should not now, probably, be embarrassed by the dilemma of either trenching upon a salutary rule of the law of evidence, or of seeming to incur the imputation of deciding that a public prostitute may be an unimpeachable witness; for if the mode of impeaching her credibility had been to inquire of the witnesses, first as to their knowledge of her general moral character, and then whether from such knowledge they would believe her upon her oath, I imagine it would have been difficult to find a witness, having any regard to his own character, and knowing her general reputation to be that of a public prostitute, who would have ventured to maintain for her the credibility of an ordinary witness.

But although I believe that the impeachment of the witness might have been reached effectually in another form of inquiry, yet I must concur with the supreme court, that it could not be in the form proposed. It certainly is a salutary and even necessary rule of evidence, that the credit of a witness should only be impeached by proof of his moral character generally, and not by proof of a particular immoral act, or by proof of a general reputation for a particular immorality, unless that particular immorality be falsehood. This principle is concurred in by all elementary writers upon evidence, and has been maintained by courts everywhere, in almost every variety of form in which it has been presented for their decision.

It has been pressed upon us with earnestness and eloquence, that the condition of a public prostitute being the most debased and demoralized state of human being that can be imagined, necessarily presupposes the absence of all moral principle, and especially that of regard for truth : and it is therefore contended that a common reputation of public prostitution, necessarily includes a common reputation for falsehood. In addition, it is urged that the laws of many [154] countries exclude the testimony of females in some cases entirely, and in all cases where any stain is attached to their character; and particularly, that the civil law expressly forbids to be received the testimony of prostitutes, or as they are termed, *mulierum, quæ quæstum corpore fecerunt*. In repect to these suggestions, it is sufficient to say, that it is not within the power of this court to subvert the established rules of evidence, and substitute new rules in their place, even were they persuaded, which I am not, that they would be preferable; and if they had this power, it might not be a very discreet exertion of it to attempt to guage crimes and graduate a standard of vices and immoralities. Loathsome, deplorable, and even detestable as is a condition of public prostitution, it is not the only vice " of a great kindred ;" theft, forgery, swindling, drunkenness, gambling, adultery, are also " well allied ;" and if we undertake to determine that the reputation of one vice necessarily includes the reputation of another, it would be difficult to say when or where we could stop. Or if we should resort to the absurd conceits and fantastical notions of the Mahomedan or of the Hindoo codes, or to the fastidious refinements of the Roman law on the subject of the competency and credibility of witnesses, our courts would speedily be enveloped in a cloud of collateral issues through which it would be impracticable to ascertain truth or administer justice. The same code which excludes the testimony of prostitutes, also excludes that of minors, relatives, guardians and domestics of the parties, pagans, apostates, heretics, &c., &c., and in short, seems to proceed wholly on the principle that the slightest inducement to falsehood is stronger than every inducement to truth. The common law in this respect, certainly is founded on juster notions of human nature, for while it so far recognizes the affinity of vice, as not to regard the testimony of a witness of bad moral character as above all exception, it rejects the conclusion that a person guilty of one immoral habit, is necessarily disposed to practice all others. And seeing that the absolute exclusion of an immoral witness may operate more to the prejudice

Bakeman *v.* Rose and wife.

than to the advancement of justice, it recognizes that dictate of common sense which no theory can refute, that the natural love of truth, when [155] combined with fear of temporal punishment, is some restraint even upon the most depraved, against the commission of a gratuitous falsehood.

The case, 14 *Mass. R.* 387, certainly is an authority, so far as it goes, to show that the general credibility of a witness may be impeached by proof that her common reputation is that of a public prostitute. But this decision was acknowledgedly in derogation of the established general rule, and its correctness was afterwards doubted by the same court. (3 *Pick,* 194.) The case of *Jackson* v. *Lewis.* (13 *Johns. R.* 504,) seems to be the only one in which the question was ever raised in our courts, and it was settled in accordance with the general rule, and as I think upon sound principles of public policy. I am, therefore, satisfied that the decision of the supreme court on this point is right.

But I am not so well satisfied that the court was correct in concluding that the charge of the court below relative to the effect of the effort to impeach the witness was substantially right. I cannot admit that where the general credibility of a witness has been impeached and sustained by an equal number of witnesses of equal knowledge and credibility, that "the character of such witness will stand as if no impeachment had been made or attempted." The law supposes every witness to be of perfect credibility, until the contrary is shown. But when this credibility has been impeached by witnesses, themselves credible, it loses its quality of perfect credibility, which cannot be restored by an equal number of witnesses, nor indeed perfectly restored by any number of witnesses. This is not the common case, where, if evidence on both sides to a particular point be precisely equal, it shall stand as if there had been no evidence in regard to it. The application of such a rule in a case of impeachment, would be to give to a witness of doubtful credibility, all the weight of one of unsuspected credibility. When, therefore, a witness has been impeached and sustained by equal weight of testimony, to say that his credit is just what it would have been if nobody had doubted it, is manifestly erroneous. An unimpeached witness is one in whose veracity every person is supposed to confide, but a witness in whose veracity one-half of [156] his acquaintances confide and the other half do not, stands upon very different ground. A good name, instead of being "better than precious ointment," would become a very cheap commodity, if it were obtainable by a person dividing his neighbors equally on the question whether he was entitled to it or not. The charge of the court below was, therefore, in this respect utterly erroneous and calculated to mislead the jury. The concluding words of the charge, that it was the province of the jury to say, "under all the circumstances, whether the witness was impeached or not," do not, in my opinion, help the matter at all. The supreme court assume that these words were precisely equivalent to charging the jury that it was their province to decide what credit the witness was entitled to. If such were the just interpretation of the words, yet standing as they do in immediate connexion with the erroneous exposition of the legal effect of the testimony to neutralize itself, they could hardly be deemed a sufficient corrective of that error. But such is not the fair interpretation of this saving clause. In referring it to the jury to say "whether the witness was impeached or not," the meaning of the court obviously is, that it is for the jury to say whether that state of facts, which the court had just decided would place the wittness " as if no impeachment had been made or attempted," did or did not exist; that is, whether an equal number of witnesses of equal knowledge and credibility, had impeached and had sustained her reputation for veracity. The erroneous conclusion of law, which the court had just previously stated, in case the testimony on this point should be regarded as equal, was still left with unimpaired force to compel the jury in that event, to give the same weight to her testimony " as if no impeachment had been made or attempted."

I admit, with the supreme court, that there may be some doubt whether this

charge was properly excepted to. There certainly appears to be some informality in the bill of exceptions in this respect. But as the charge of the court is distinctly set out in the bill of exceptions, and the fact certified by the judges, that the defendant did in due manner propose his exceptions to it, and as this is the only matter contained in the charge, I [157] am disposed to regard the exception as sufficiently presented; and more especially as the supreme court have so treated it. In this view of the case, I am for reversing the judgments below, to the end that a *venire de novo* be issued.

On the question being put, *Shall this judgment be reversed?* all the members of the court, (23 being present,) with the exception of *Senators* TRACY, JOHNSON and VAN DYCK, voted in the negative; whereupon the judgment of the supreme court was AFFIRMED.

Judgment affirmed.